### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| TASHA ANN SHAVER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:13-00133 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order entered January 4, 2013

(Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to

consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation

for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the

parties' cross-Motions for Judgment on the Pleadings (Document Nos. 10 and 13.) and Plaintiff's

Reply. (Document No. 14.)

The Plaintiff, Tasha Ann Shaver (hereinafter referred to as "Claimant"), filed an application

for SSI on March 11, 2010 (protective filing date), alleging disability as of October 1, 2008, due to

diabetes, a thyroid condition, an inability to lift, her ribs do not stay in place, problems with

memory, sleep apnea, traumatic brain injury (2007), anxiety, and depression. (Tr. at 13, 90, 98, 101,

167-68, 169-70, 173-76, 183, 186.) The claims were denied initially and upon reconsideration. (Tr.

at 82-85, 90-92, 98-100, 101-03.) On February 1, 2011, Claimant requested a hearing before an

Administrative Law Judge (ALJ). (Tr. at 104-05.) The hearing was held on August 16, 2011, before

the Honorable Joseph T. Scruton. (Tr. at 36-77.) By decision dated October 11, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-30.) The ALJ's decision became the final decision of the Commissioner on November 15, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On January 3, 2013, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §416.920 (2011). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the

2

Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2011). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we

3

consider when we rate the degree of your functional limitation.

      (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

      (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§

---

      [1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since April 1, 2007, the amended alleged onset date. (Tr. at 15, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "status-post motor vehicle accident in April 2007 with physical and head injuries; obesity; residual degenerative joint disease of the right hip, left femur, spine, and pelvis; major depressive disorder; and cognitive disorder vs. low IQ," which were severe impairments. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for sedentary work as follows:

> [T]he [C]laimant can occasionally stoop, kneel, and crouch; can never climb ladders or crawl; can maintain attention and concentration throughout a workday for one-to-two step instructions in a routine work environment; can tolerate no more than minimal interaction with the public, coworkers, and supervisors, defined as three to four brief visits a day; and can perform jobs with very basic reading and writing requirements involving predominantly small words.

(Tr. at 18, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 28, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as an addressing clerk, a textile cutter, and a stuffer, at the sedentary level of exertion. (Tr. at 29, Finding No. 10.) On this basis, benefits were denied. (Tr. at 30, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was born on August 19, 1972, and was 38 years old at the time of the administrative hearing, August 16, 2011. (Tr. at 28, 46, 169, 173.) Claimant had at least a high school education and was able to communicate in English. (Tr. at 29, 46, 185, 186-87.) In the past, Claimant worked as a certified nursing assistant. (Tr. at 28, 46, 187-88, 193-94, 201-08.)

6

The Medical Record

      The Court has reviewed all evidence of record, including the medical evidence, and will discuss it below as it relates to Claimant's arguments.

    *Charleston Area Medical Center ("CAMC")*:

      Claimant was involved in a motor vehicle accident on April 1, 2007, in which she suffered multiple physical injuries and a closed head injury with multiple intracranial hemorrhages. (Tr. at 604-05.) Dr. Kenneth C. Wright, M.D., examined Claimant on April 11, 2007, the day she was discharged from the medical center. (Tr. at 594-95.) He noted the CT scan of Claimant's brain showed multiple areas of hemorrhaging. (Tr. at 594.) He also noted that on exam, she was mildly agitated, but responded well to conversation. (Id.) Her behavior generally was socially appropriate, though she was disinhibited and showed her genitals and scratched herself. (Id.) He diagnosed, *inter alia*, traumatic brain injury with significant cognitive deficits and an impaired ability to perform mobility and activities of daily living skills. (Tr. at 595.) He noted that she was being admitted for a comprehensive medical rehabilitation program for approximately three to four weeks. (Id.) Claimant underwent medical rehabilitation at the hospital from April 26, 2007, through March 14, 2008. (Tr. at 589-97.) On April 19, 2007, Dr. Ramon S. Lansang, Jr., M.D., noted that Claimant was having significant behavioral issues in terms of emotional lability with agitation but was redirectable and had improvement with her attention. (Tr. at 596.) She required maximal assistance for comprehension and expression. (Id.) On April 26, 2007, Dr. Lansang noted that Claimant had improved in terms of her emotional lability, orientation, and awareness. (Tr. at 597.) She was discharged on May 2, 2007, from the inpatient medical rehabilitation. (Tr. at 592-93.) At the time of discharge, Claimant had mild to moderate cognitive impairment per speech therapy reports, impaired abstract reasoning, average judgment, impaired immediate memory recall, low average

delayed recall, and was mildly to moderately impaired psychologically. (Tr. at 592.) She was instructed to continue with occupational therapy for activities of daily living and cognitive retraining, as well as speech therapy for cognitive linguistic retraining. (Tr. at 593.)

A CT scan of the head on October 26, 2007, was normal without any evidence of hemorrhaging. (Tr. at 591.) Claimant attended the outpatient clinic for rehabilitation on March 14, 2008, at which time she reported some visual deficits resulting from the brain injury and indicated that she had not been cleared to drive. (Tr. at 589.) Claimant reported that she was interested in returning to work. (Id.) Dr. Lansang saw no problems with her returning to work with certain physical limitations and if she avoided balancing issues and dealing with a stressful environment, such as people and multi-tasking. (Id.) Claimant was instructed to return to the clinic as needed. (Tr. at 590.)

_Katherine Ball, M.S., Licensed Psychologist - Psychological Evaluation_:

Ms. Ball completed a psychological evaluation of Claimant on October 9, 2007, approximately six months after her accident, at the request of the state agency. (Tr. at 298-303.) Claimant reported that she had been remarried for two years and that she, her husband, and her two sons had been living with her in-laws since August 2007. (Tr. at 299.) Claimant denied any depressive symptoms or anxiety, but reported that she worried a lot and tired easily. (Id.) She reported that she received special education services throughout school, with the exception of social studies and health and also took regular math classes until her senior year when she received special education services for algebra. (Tr. at 300.) She repeated the first and fourth grades. (Id.) Results of the Wechsler Adult Intelligence Scale ("WAIS-III"), revealed a Verbal IQ of 67, a Performance IQ of 86, and a Full Scale IQ of 74. (Tr. at 301.) Results of the WRAT-4 revealed a fifth grade reading and math level and a seventh grade spelling level. (Id.) Ms. Ball opined that the results of

these tests were valid. (Id.) Results of the Cognistat assessment revealed a mild impairment in only the memory category. (Id.)

Ms. Ball noted that Claimant's mental status exam was normal with the exception of mildly impaired psychomotor behavior, moderately deficient judgment, and mildly deficient immediate memory and concentration. (Tr. at 302.) She opined that Claimant's persistence, pace, and social functioning were within normal limits. (Id.) She noted that Claimant independently was able to cook and perform her personal care and required assistance with housecleaning, laundry, driving, and childcare. (Id.) She diagnosed borderline intellectual functioning based on the Full Scale IQ of 74. (Id.) She noted however that Claimant's Verbal IQ was "in the mild mental retardation range and may be below previous level of functioning." (Id.) She also noted that there was a significant discrepancy between Claimant's Performance and Verbal IQ scores and that her Full Scale IQ was consistent with special education services she received in school. (Id.) Ms. Ball opined that Claimant's intellectual functioning "may limit the areas of training available to her," but noted that she had a good attitude and would be amenable to training when released by her physician. (Tr. at 303.)

*Tina Fontenot, M.S., Licensed Psychologist - Consultative Evaluation*:

On March 2, 2009, nearly two years after Claimant's accident, Ms. Fontenot, conducted a consultative evaluation of Claimant at the request of the state agency. (Tr. at 373-77.) Claimant reported that she resided with her husband and two sons in an apartment she was renting. (Tr. at 373.) Claimant reported anxiety and nervousness on a daily basis and that she grinded her teeth at night, sleep disturbance in the form of initial insomnia and intermittent awakenings, low energy and fatigue on a daily basis, and memory loss to content and forgetfulness. (Tr. at 374.) She indicated that she worked sixteen years as a certified nursing assistant ("CNA") in a nursing home and four

9

months at McDonald's. (Tr. at 375.) She also did private sittings for the elderly and some babysitting. (Id.)

Ms. Fontenot observed that Claimant's mental status exam was within normal limits with the exception of a moderately deficient immediate and remote memory, severely deficient recent memory, and mildly deficient concentration. (Tr. at 376.) She noted that Claimant's mood was euthymic, her affect was broad, and her insight was fair. (Id.) Social functioning, persistence, and pace were within normal limits. (Id.) Ms. Fontenot noted Claimant's activities of daily living to have included spending time with her mom, sister, husband, and father-in-law; grocery shopping; cleaning her apartment; waking the children for school and getting them on the bus; taking care of the laundry, dishes, and cooking; playing the Nintendo DS; playing on the computer; making quilts; and doing crafts. (Id.) Claimant's husband assisted her with the cooking and grocery shopping and she independently managed the childcare and her personal care. (Id.) Ms. Fontenot diagnosed anxiety disorder NOS and borderline intellectual functioning. (Id.) The second diagnosis was based on the results of Ms. Ball's IQ testing. (Tr. at 377.) Ms. Fontenot opined that Claimant's prognosis was fair, and that she was unable to manage her finances. (Id.)

*Seneca Health Services, Inc.*:

Claimant sought treatment at Seneca Health Services due to problems with agitation, anger, and depression, and was evaluated by Mike McDaniel, M.A., a licensed psychologist, on May 1, 2009, at the request of her attorney. (Tr. at 370-71.) Mental status exam revealed slowed psychomotor activity, marginally adequate attention and concentration, limited abstract verbal reasoning skills, fair judgment and insight, and an anxious and depressed mood. (Tr. at 370.) Claimant scored a 78 on the Slosson Intelligence Test - Revision 3 ("SIT-R3") and Mr. McDaniel found that she fell within the "Borderline Mentally Handicapped range of intellectual ability." (Id.)

10

Mr. McDaniel however, made no Axis II diagnosis regarding this finding. (Tr. at 370-71.) Results of the Beck Inventories suggested severe depression and mild anxiety. (Tr. at 371.) Mr. McDaniel diagnosed depressive disorder NOS and assessed a GAF of 50.[1] (Id.) He recommended therapy for her anxiety and depression and noted that given Claimant's "below-average level of intellectual ability," psychotherapeutic approaches would be more beneficial in the form of skill training or problem solving oriented approaches rather than completely insight-oriented approaches for greater success. (Id.)

On May 11, 2009, Claimant was evaluated by P. Michelle O'Dell, PA-C. (Tr. at 368-69.) Claimant reported feelings of sadness, crying episodes, and extreme agitation accompanied by yelling, cussing, and punching objects. (Tr. at 368.) Mental status exam essentially was normal and Ms. O'Dell diagnosed mood disorder NOS and assessed a GAF of 50, and prescribed Clonazepam .5mg for the agitation. (Tr. at 369.) On June 2, 2009, Claimant reported that the Klonopin was beneficial to some degree but made her sleepy. (Tr. at 453.) She reported continued irritability and excessive worry. (Id.) Mental status exam essentially was normal and Ms. O'Dell prescribed Celexa 20mg in addition to the Klonopin. (Id.) Her prognosis was good. (Id.) On July 2, 2009, Claimant reported that her symptoms were uncontrolled as she had excessive worry. (Tr. at 451.) Ms. O'Dell replaced Celexa with Lexapro 10mg. (Id.) On August 10, 2009, Dr. Noel Jewell, M.D., noted that Claimant continued to be slightly depressed and increased the Celexa to 40mg a day. (Tr. at 449.) He noted her decreased interest in things she used to enjoy, decreased energy, decreased appetite, and an inability to concentrate. (Id.) He advised her to take the Klonopin only as needed. (Id.)

---

[1] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

Claimant reported on September 8, 2009, and October 6, 2009, that everything had been going well and that she felt much better. (Tr. at 446-47.) Dr. Jewell continued her medications. (Id.) On November 5, 2009, Claimant reported that she had gotten a job at McDonald's and could not wait to start working. (Tr. at 445.) Dr. Jewell expressed concern that she was setting herself up for failure. (Id.)

Dr. Jewell re-evaluated Claimant on December 8, 2009, and found that her mental status exam essentially was normal. (Tr. at 443-44.) He changed her diagnosis to major depressive disorder because she had not manifested any other manic symptoms and more depression, and found that her GAF remained at 50. (Tr. at 444.) On February 2, 2010, Claimant reported that her children were in Child Protective Custody due to allegations that her husband abused the children. (Tr. at 441.) Claimant's affect was generally dysthymic, her mood was congruent, and she felt depressed. (Id.) Claimant reported on March 2, 2010, that she was distraught and filed for divorce because her husband had sexually abused her children. (Tr. at 439.) She felt anxious and Dr. Jewell increased the Clonazepam slightly. (Id.) Her response to treatment has been good. (Id.) She reported on March 10, 2010, that she was on the verge of a nervous breakdown and had feelings of severe depression and hopelessness. (Tr. at 437.) She was tearful throughout the interview and Dr. Jewell prescribed Abilify 2mg. (Id.) On April 2, 2010, she reported to Jaclyn Adkins, PA-C, that she felt stressed because her children were in foster homes. (Tr. at 435.) Claimant was encouraged to undergo counseling. (Id.) On May 12, 2010, Claimant reported that apparently the West Virginia Department of Health and Human Resources ("WV DHHR") told her that she was mentally ill, needed a guardian appointed, and could no longer care for her children. (Tr. at 433.) Dr. Jewell noted that she later stated she no longer needed a guardian and continued her on her medications. (Id.) On June 10, 2010, Dr. Jewell noted that Claimant was coming to grips with the fact that she was not going to

regain custody of her children. (Tr. at 431, 558.) He noted that she had a full affect and that she was feeling better. (Id.)

Claimant reported on July 9, 2010, that she was doing well, and Dr. Jewell continued her medications. (Tr. at 548, 556.) On August 9, 2010, Claimant presented with a broad affect and euthymic mood. (Tr. at 546, 554) She reported that she was doing well and was going to North Carolina to visit her brother for two months. (Id.) Dr. Jewell gave her two months' supply of all her medications. (Id.)

*Individual Psychotherapy*:

Claimant began individual psychotherapy with Harriet Warf, M.A., on May 11, 2009. (Tr. .at 513.) Claimant reported that she angered easily, was depressed and agitated, and was unable to work. (Id.) Ms. Warf attempted to build rapport with Claimant at the first session. (Id.) On May 27, 2009, Ms. Warf continued to work on decreasing depression and introduced anger management. (Tr. at 512.) Claimant made some change to her routine and was getting more sleep but continued to feel irritable and stated that she did not like being "short" with her family. (Id.) Ms. Warf noted that Claimant was comprehending. (Id.) On July 6, 2009, Ms. Warf focused on reducing anger and agitation with Claimant. (Tr. at 511.) Claimant reported that she was calm most of the time and that when she got mad, she got over it quicker. (Id.) Ms. Warf noted that Claimant was motivated to change and responded well to treatment. (Id.) On July 30, 2009, Claimant continued to work on anger management and she noted that she saw improvement in her irritability. (Tr. at 510.) Claimant reported that she had become more tolerant and got over her agitation quicker. (Id.) She recalled only two times having gotten upset in a few week period, and reported that she was sleeping somewhat better. (Id.) On August 28, 2009, the focus of therapy was on Claimant's reported depression. (Tr. at 509.) On September 25, 2009, Claimant reported that she had "been doing good,"

and that she rarely was angry and was no longer easily agitated. (Tr. at 508.) Ms. Warf recommended that the therapy be discontinued due to Claimant's improvement in anger management and coping skills. (Id.)

Claimant returned to therapy on February 2, 2010, after her two children had been removed from her home by CPS. (Tr. at 507.) Claimant reported that she had cried a lot, was angry and depressed, was not sleeping well, and felt overwhelmed. (Id.) Ms. Warf decided to resume her therapy sessions. (Id.) On February 16, 2010, Claimant reported anxiety, poor sleep, and feeling overwhelmed. (Tr. at 506.) Claimant continued in treatment for depression and anxiety on March 2, April 2, and May 19, 2010. (Tr. at 503-05.) On May 19, 2010, Claimant reported that she had trouble "remembering things." (Tr. at 503.) Claimant reported on June 25, 2010, that her mother had been appointed as her guardian and had her mother join her therapy session. (Tr. at 502.) Claimant presented with a sad affect and reported some memory problems. (Id.) Ms. Warf found that Claimant's mother's presence was beneficial to help remind and encourage her of certain things given that she had some brain damage from the accident. (Id.)

*Misti Jones-Wheeler, M.S., Licensed Psychologist - Neuro-Behavioral Profile*:

On August 5, 2010, Ms. Jones-Wheeler evaluated Claimant at the request of the state agency. (Tr. at 560-66.) Claimant was cooperative and presented with a serious attitude. (Tr. at 560.) She reported depression, anxiety, low energy, anger problems, getting angry with herself and getting easily frustrated, crying on and off, increased depression with the loss of her children, poor memory, occasional hearing of music when there was no music, and a pretty good appetite. (Tr. at 561.) Claimant reported that she had a learning disability in reading, with poor comprehension that had worsened since the accident. (Tr. at 562.) Claimant explained that her children were placed in foster care due to her husband having sexually abused them. (Tr. at 561) She signed away her parental

14

rights and reported that she was not psychologically or mentally capable of caring for her children due to a traumatic brain injury and mental illness resulting from such. (Id.)

Mental status exam revealed somewhat slowed thought processes, fair to intact insight, mildly deficient immediate memory and concentration, and mild to moderately deficient remote memory. (Tr. at 563.) Her persistence and pace were within normal limits. (Id.) Results of the WAIS-IV revealed the following scores: Verbal Comprehension: 68, Perceptual Reasoning: 79, Working Memory: 83, Processing Speed 76, and Full Scale IQ of 71. (Id.) Scores on the Cognistat were within the normal range. (Tr. at 564-65.) Ms. Jones-Wheeler determined that these scores were valid. (Id.) Regarding Claimant's social functioning, Ms. Jones-Wheeler found Claimant somewhat immature and intellectually low functioning, but noted that she maintained appropriate eye contact, was not distant, and exhibited a sense of humor. (Tr. at 564.) She noted her daily activities to have included helping her mother with household chores, playing solitaire, working on crafts, and taking her medications with reminders. (Id.) Ms. Jones-Wheeler diagnosed depressive disorder NOS. (Id.) She deferred an Axis II diagnosis of her intellectual ability because she lacked prior psychological or educational testing records to determine whether her current level of functioning was consistent with prior testing completed prior to her brain injury or whether there was a cognitive disorder. (Tr. at 565.)

### Frank Roman, Ed.D. - Psychiatric Review Technique:

On August 25, 2010, Dr. Roman, a state agency expert, completed a form Psychiatric Review Technique on which he found that Claimant's borderline intellectual functioning, depressive disorder, and anxiety disorder NOS resulted in mild limitations of activities of daily living; moderate limitations in maintaining social functioning, concentration, persistence, and pace; and no episodes of decompensation each of extended duration. (Tr. at 567-80.) He further found that Claimant did

not meet or equal Listings § 12.02, § 12.04, or § 12.06. (Tr. at 577-79.)

Dr. Roman also completed a form Mental RFC Assessment on which he found that Claimant was moderately limited in the following nine mental activities: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently of others. (Tr. at 581-83.) Dr. Roman noted that Claimant retained the capacity to understand one and two-step instructions and make simple, work-related decisions. (Tr. at 583.) He further noted that she had the ability to respond to supervision, adapt to her work environment, and would function better in a setting with minimal social interaction requirements. (Id.)

On December 30, 2010, Dr. G. David Allen, Ph.D., affirmed Dr. Roman's assessment as written. (Tr. at 585.) On January 14, 2011, Dr. H. Hoback Clark, M.D., also affirmed the assessment. (Tr. at 587.)

Claimant's Challenges to the Commissioner's Decision

Claimant first argues that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that she met the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05C. (Document No. 10 at 1, 12-17.) Specifically, Claimant asserts that the ALJ failed to discuss whether she even met the listed impairment. (Id. at 13.) Claimant contends that she meets the requirements of § 12.05C in the first instance because the ALJ

16

found that she has severe physical impairments resulting in significant work-related functional limitations, as well as depression. (Id. at 13-14.) Secondly, Claimant contends that she has the requisite IQ scores as evidenced by those obtained by Ms. Ball and Ms. Jones-Wheeler. (Id. at 14.) Finally, Claimant contends that her school records demonstrate that her intellectual deficits manifested before the age of twenty-two, thereby satisfying the third requirement of § 12.05C. (Id.) She explains that IQ testing in 1986, when she was 13 years old revealed a verbal IQ score of 72, a performance IQ of 95, and a full scale IQ of 81. (Id.) Additionally, she was held back two grades and received special services for learning disabled students beginning in the first grade. (Id.) Increased services were provided in the sixth grade and when she reached the tenth grade, she was receiving special education instruction in all academic areas. (Id. at 14-15.) She was tested again at the age of 17 years old and received a verbal IQ score of 77, a performance IQ of 96, and a full scale IQ of 83. (Id. at 15.)

In response, the Commissioner asserts that contrary to Claimant's argument, the ALJ properly considered Claimant's mental functioning under Listing § 12.02 because she alleged memory loss from her closed head injury in 2007, as a reason for not returning to work. (Document No. 13 at 13-16.)  The Commissioner notes that Claimant never alleged that she was mentally retarded, and the ALJ therefore, properly focused his analysis on Listing § 12.02 rather than § 12.05C. (Id. at 13.) The ALJ was not required to consider Claimant's mental functioning under Listing § 12.05C, the Commissioner asserts, because Claimant unequivocally was functioning in the borderline range and not in the mentally retarded range. (Id. at 16-19.) Ms. Kesecher, the examining psychologist, specifically noted that the discrepancy in Claimant's IQ scores was not a result of mental retardation. (Id. at 16.) The Commissioner notes that the medical record supports a finding that Claimant functioned in the borderline range and was not mentally retarded. (Id. at 16-17.) Ms.

Ball diagnosed borderline intellectual functioning and noted that Claimant trained new CNA's, wrote reports, and took blood pressure readings. (Id. at 17.) Ms. Fontenot also diagnosed borderline intellectual functioning and noted that Claimant did private sittings for the elderly and baby sittings. (Id.) Ms. McDaniel noted that Claimant was performing in the upper end of the borderline range. (Id.) Ms. Warf diagnosed limited intellectual functioning and noted that Claimant was able to comprehend. (Id.) Likewise, Dr. Jewell consistently found that her mental status was within normal limits and Dr. Durham noted that there was no presence of a psychological abnormality. (Id. at 18.) Finally, Drs. Roman and Allen evaluated Claimant's impairments under Listings § 12.02 and § 12.04, and not under § 12.05C. (Id. at 18-19.) Thus, the Commissioner contends that there is no conflict as to whether Claimant's low IQ scores are attributable to mental retardation or a traumatic brain injury. (Id. at 19.)

Finally, the Commissioner asserts that assuming Claimant was diagnosed as mentally retarded, she does not meet or equal Listing § 12.05C, because she had no significant deficits in adaptive functioning prior to the age of 22. (Document No. 13 at 19-21.) Furthermore, the Commissioner notes that Claimant's 16-year work history was characterized as semi-skilled, and therefore, inconsistent with someone "who failed to adapt to common life demands." (Id. at 20.) She also was married twice, raised children, and participated in a variety of hobbies, which contradicts someone characterized with deficits in adaptive functioning. (Id.) Accordingly, the Commissioner asserts that Claimant does not meet or equal Listing § 12.05C. (Id. at 20-21.)

In Reply, Claimant asserts that pursuant to POMS Section DI 24515.056 Evaluation of Specific Issues - Mental Disorders - Determining Medical Equivalence, the ALJ was required to consider the combination of her impairments and compare them to the most closely analogous listed impairment. (Document No. 14 at 2-3.) Because she had low IQ scores and a history of special

18

education services that predated her motor vehicle accident which resulted in a traumatic brain injury, Claimant alleges that the ALJ should have considered whether her condition also equaled Listing § 12.05C. (Id.) The ALJ noted in his opinion that there was a conflict when he found that Claimant's severe impairment was "cognitive disorder vs. low IQ." (Id. at 3.) Claimant therefore, contends that the ALJ identified the conflict and had a duty to resolve it, or at the least, should have considered the impairment under both Listings §§ 12.02 and 12.05. (Id.)

Claimant also alleges that the ALJ failed to include in his hypothetical question posed to the vocational expert ("VE"), limitations based on Claimant's low intellectual functioning that would necessitate increased supervision in a job setting. (Document No. 10 at 17-20.) Claimant contends that this limitation combined with the limitation of minimal interaction with co-workers and supervisors would significantly erode the number of sedentary unskilled jobs. (Id. at 17-18.)

Analysis.

1. Listing § 12.05C.

Claimant first alleges that the ALJ erred in failing to consider whether she met Listing Impairment §12.05C. (Document No. 10 at 1, 12-17.)  "The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2011). Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to  significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2011). The required level of severity

19

for Listing § 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

> B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

To meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2011). The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. United States Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2011). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of section 12.05C. Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The Secretary's finding that Luckey suffers from

20

> a severe combination of impairments also establishes the second prong of section 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, and as stated by the ALJ, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 3044 (Mark H. Beers, M.D. & Robert S. Porter, M.D., eds., 19th ed. 2011) (defining mental retardation, now referred to as "intellectual disability," as "significantly subaverage intellectual functioning (often expressed as an intelligent quotient < 70 to 75) combined with limitations of > 2 of the following: communication, self-direction, social skills, self-care, use of community resources, and maintenance of personal safety. Management consists of education, family counseling, and social support).[2] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in her particular age group, sociocultural background, and community setting. Id. at 40. The Regulations make clear that Listing § 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria

---

[2] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning. Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

(paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

In his decision, the ALJ considered Claimant's mental impairments under Listings §§ 12.02 and 12.04, but not under § 12.05C, and found that she failed to meet or equal either Listing. (Tr. at 17-18, 21-26.) The ALJ acknowledged that Claimant suffered a traumatic brain injury and was functioning low intellectually, but that the evidence failed to establish that she was precluded mentally from performing any work. (Id.) He noted that she had received psychiatric treatment since 2009, and that treatment notes revealed only mild abnormalities and essentially normal mental status examinations, coupled with Claimant's frequent reports that she was doing well. (Tr. at 25.) The ALJ also acknowledged Claimant's low IQ but noted that objective findings were relatively benign. (Id.) He found that although she was assessed with a GAF of 50, he noted that such score was only one point from the moderate category. (Id.) Finally, the ALJ noted that the treatment records failed to demonstrate any serious symptoms or reduced levels of mental functioning. (Tr. at 26.)

An ALJ has a duty to identify the relevant listed impairments and compare each of the listed criteria to the evidence of the claimant's symptoms. See Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). Without such an explanation, it is impossible for a reviewing court to determine whether there was substantial evidence to support the ALJ's decision. Cook, 783 F.2d at 1173. This rule however, is not inflexible requiring discussion of each listing, point-by-point. The duty of explanation is said to be triggered when "there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." Ketcher v. Apfel, 68 F.Supp.2d 629, 645 (D.Md. 1999).

22

In the instant case, the undersigned finds that given Claimant's special education classes in school, combined with her low IQ scores before and after the age of 22 and the multiple diagnoses and references to her low intellect, the evidence warranted at least an analysis by the ALJ respecting her intellectual abilities under § 12.05. The ALJ acknowledged at step two that Claimant's severe mental impairment consisted of a cognitive disorder versus low IQ. Nevertheless, at step three, he chose to consider only the cognitive and mood disorder aspects under §§ 12.02 and 12.04. Undoubtedly Claimant neither was diagnosed as being mentally retarded nor did she allege the same as a disabling impairment. A diagnosis, however, is not required and the failure to allege such an impairment should not prevent the ALJ from considering an impairment when the evidence suggests that it may exist. The Commissioner argues that Claimant cannot meet the Listing because she did not have the deficits in adaptive functioning prior to the age of 22. The ALJ did not perform any analysis under § 12.05C, and therefore, the undersigned has nothing to review. It is not appropriate for this Court to make a decision as to whether Claimant does or does not meet Listing § 12.05C. The undersigned finds that the evidence is sufficient that the ALJ should have considered Claimant's mental impairments under Listing § 12.05C and that remand is warranted for this reason.[3]

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the District Court confirm and accept the foregoing findings, **GRANT** Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **DENY** Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter for further proceedings consistent with this Proposed Findings and Recommendation pursuant to the

---

[3] The undersigned has recommended that this matter be remanded for consideration of Claimant's intellect under Listing § 12.05C. Consequently, the undersigned does not consider Claimant's remaining argument regarding the ALJ's failure to include in a hypothetical question the need for increased supervision in a job setting based on Claimant's lower intellectual functioning.

fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 26, 2014.

R. Clarke VanDervort
United States Magistrate Judge

24